Dustin L. Clark (UT Bar #12003)
Run-Zhi Lai (UT Bar # 18456)
HEPWORTH LEGAL
320 W 500 S, Suite 200
Bountiful, Utah 84010
(801) 872-2222
Dustin@HepworthLegal.com
Run-Zhi@HepworthLegal.com
*Attorneys for Plaintiff Maria Thomson*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| MARIA THOMSON,<br><br>       *Plaintiff*,<br><br>*v.*<br><br>AMERITECH COLLEGE LLC D/B/A JOYCE UNIVERSITY OF NURSING AND HEALTH SCIENCES,<br><br>       *Defendant*. | **COMPLAINT**<br><br>Case No. _____ |

Plaintiff, Maria Thomson, by and through counsel, Hepworth Legal, complains, states, alleges and claims as causes of action against defendant as follows:

### PRELIMINARY STATEMENT

1.      This is a Complaint for damages and injunctive relief brought by a student of Joyce University of Nursing and Health Sciences. Plaintiff seeks declaratory judgment, permanent injunctive relief, and damages as well as legal and equitable relief from Defendant's policies and actions which have violated and continue to violate Plaintiff's rights pursuant to Title III of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12181 *et seq.* (2002), and Section

504 of the Rehabilitation Act ("Rehabilitation Act"), 29 U.S.C. § 794 *et seq.* (2011). Plaintiff seeks injunctive relief requiring Defendant to correct their violations of Plaintiff's rights, prohibiting Defendant from continuing their misconduct in violation of the ADA and Rehabilitation Act, and from engaging in similar conduct in the future. Plaintiff seeks attorney's fees and court costs pursuant to 42 U.S.C. § 12205 (2010) and 29 U.S.C. § 794(a).

## JURISDICTION AND VENUE

2.     This Court has jurisdiction to hear and decide Plaintiff's claims pursuant to 42 U.S.C. §§ 12188-89, as the Plaintiff's claims arise under and are based upon violations of Title III of the ADA, 42 U.S.C. §12182, *et seq.*, and Section 504 of the 1973 Rehabilitation Act, 29 U.S.C. § 794.

3.     This Court is vested with original jurisdiction of these claims pursuant to 28 U.S.C. §1331 and §2201.

4.     Venue for this action is proper in the United States District Court for the District of Utah, Central Division pursuant to 28 U.S.C. §§ 125 and 1391(b) and (c) and because the claims arose in said division and district and, further, because Defendant conducts business in such district. The subject public accommodations immediately at issue are located in Salt Lake County, Utah.

## PARTIES

5.     Plaintiff Maria Thomson at all relevant times was a resident of the State of Utah and was a student at Joyce University of Nursing and Health Sciences, formerly Ameritech College. Ms. Thomson is currently a resident of the State of Utah.

6.     Defendant AMERITECH COLLEGE LLC D/B/A JOYCE UNIVERSITY OF NURSING AND HEALTH SCIENCES (hereafter, "JOYCE"), is a Utah for-profit limited liability company, with its principal location of business located in Salt Lake County, State of Utah and operates JOYCE as a public educational institution of higher learning.  Upon information and belief, JOYCE received and continues to receive federal funding.

## GENERAL FACTUAL ALLEGATIONS

7.     Ms. Thomson is an individual with Postural Orthostatic Tachycardia Syndrome (POTS) and autonomic dysfunction.

8.     By way of background, POTS is a syndrome of circulatory insufficiency (similar to diastolic heart failure) due to impaired response by the autonomic nervous system when an individual is standing upright.  In people with POTS, standing may result in a rapid heart rate without a drop in blood pressure due to excessive adrenergic compensation (often referred to as an adrenaline dump) which stimulates a sympathetic nervous system response.  This response causes an increase in heart rate, often to a rate greater than 120 beats per minute when just being upright, indicating that the cardiovascular system is working hard to maintain blood pressure and blood flow to the brain.

9.     The primary symptoms of POTS when upright are dizziness, lightheadedness, palpitations, generalized weakness, shakiness, fatigue, headaches, sweating, anxiety, and difficulty concentrating.  The lightheadedness and fainting can be alleviated by lying down and, in many cases, sitting or crouching down on the floor.  The symptoms are unpredictable, and each case is unique.  Symptoms usually become worse after exposure to heat, stressors, excitement, or physical

activity. Treatment for POTS includes medication, non-pharmacological methods, and life accommodations.

10.     Unfortunately, Ms. Thomson has experienced many symptoms that frequently occur with POTS. To help her manage POTS, Ms. Thomson has a central intravenous (IV) line implanted to treat significantly low blood volume, which leads to clinical symptoms of POTS.

11.     Ms. Thomson is an individual with a disability within the meaning of the ADA and the Rehabilitation Act.

12.     In January 2022, Ms. Thomson enrolled in the RN/BSN nursing program at JOYCE, a three-year program.

13.     When Ms. Thomson started at JOYCE, she already completed a significant portion of her academic study in another educational institute and transferred 42 credits to JOYCE. Therefore, Ms. Thomson started at JOYCE as a second-year nursing student.

14.     Ms. Thomson successfully completed three semesters (1 academic year) with JOYCE.

15.     JOYCE dismissed Ms. Thomson from the nursing program through their external legal counsel on March 23, 2023, alleging violations of the student code of conduct. By that time, Ms. Thomson's study was on the 11th week of a 15-week semester and in the final year of her nursing program, and she was set to graduate in December of 2023.

16.     As soon as she was accepted to the nursing program, Ms. Thomson applied for accommodations under the ADA. However, almost from the very beginning, Ms. Thomson's reasonable accommodation requests to JOYCE were met with resistance and reluctance.

17.     Ms. Thomson's reasonable accommodation requests mainly fall into three categories: use of a service animal, excused absence due to medical condition, and examination accommodation.

18.     First, Ms. Thomson has a service dog (named "Daisy") accompanying her in order to help monitor and manage her disability and illness.  Ms. Thomson did (still does) use methods such as medication, increased fluids with salt and electrolytes, and a watch monitoring her health and heart rates to manage her disability.  While these other methods are not as effective as her service dog, Ms. Thomson can navigate using those other methods for short periods of time.  Therefore, Ms. Thomson's first part of reasonable accommodation comprises permission to have her service dog accompany her in class, lab, and clinical placement.

19.     Second, Ms. Thomson requested that JOYCE modifies of its rigid one-absence policy to excuse occasional disability-related absences.  In order to treat POTS, Ms. Thomson's treating physician prescribed the use of intravenous fluids.  Because it is a long-term treatment, a central IV (hereafter the "central line") was implanted in Ms. Thomson's body, which is directly above her heart.  This IV line provides necessary and critical medical treatment for Ms. Thomson's disability.  However, this IV line is subject to contamination and infection, regardless of how carefully Ms. Thomson maintains and cleans the IV site.  Because of the location of the IV line (directly above her heart), contamination and infection could quickly result in a microbial infection in the bloodstream and septic shock if not diagnosed and treated quickly.  To further compound the issue, the only realistic place to diagnose blood infection for patients in a situation like Ms. Thomson's is the emergency room of a hospital.  Ms. Thomson cannot simply walk into a blood draw station/laboratory to get a diagnosis.  It is well known that an emergency room's wait time

could take hours without manifested acute symptoms. Moreover, blood infection symptoms often confuse with symptoms from a common cold, flu, and other common diseases.

20.     Because of the location of the central line, the seriousness of a blood infection, and the severity of her past infections, Ms. Thomson's treating physician may require her to visit the emergency room when she reports symptoms that may link to an infection.

21.     JOYCE has a strict absence policy allowing one absence from each course. Many courses in the nursing program at JOYCE have multiple modules. For example, a course may comprise a classroom lecture module, a laboratory module, and a clinic module. However, it was unclear if JOYCE's absence policy applies to each module of each course or to the entirety of the course. Ms. Thomson made numerous requests to JOYCE for clarification, but received different answers from faculty, staff, and administrators of JOYCE.

22.     JOYCE interpreted Ms. Thomson's requests for clarification of JOYCE's policies as "abusing the absence policy," despite the fact that Ms. Thomson was merely exercising her rights in requesting accommodations and clarification of JOYCE's policies.

23.     Ms. Thomson requested JOYCE to excuse her absence for emergency room visits, hospitalizations, procedures, and other documented medical appointments due to medical events caused by her disability. JOYCE refused to provide such assurance but would only agree to "review on case-by-case basis."

24.     However, not every visit to an emergency room resulted in a serious diagnosis. Most were scare incidents. But as explained herein, Ms. Thomson has to visit the emergency room and get a medical examination when symptoms appear. Therefore, it is not clear to anyone— JOYCE included—whether JOYCE would excuse Ms. Thomson's medical visits to the emergency

room when they did not result in hospitalization.  Even though it is a straightforward question, JOYCE never gave a straightforward answer to Ms. Thomson's inquiries.

25.     Because of JOYCE's lack of assurance, clarity, and transparency regarding absences due to disability-related medical events, Ms. Thomson delayed her treatments or left her treatment early for fear of incurring an absence and thus being forced to withdraw from the affected course.

26.     One of the delays led Ms. Thomson to become septic and she was hospitalized.  On June 28, 2022, Ms. Thomson missed her skills lab due to hospitalization resulting from an infection from the central IV line.  Even under these circumstances, JOYCE would not confirm if Ms. Thomson's absence from the class was excused.

27.     All lectures and labs were recorded at JOYCE and were accessible to students to be watched later.  Skills lab also had regular make-up sessions throughout the semester.  Students who had absences from any of the modules were required to make up the missed sessions.

28.     The third part of Ms. Thomson's reasonable accommodation to JOYCE comprises examination accommodation.

29.     During her third semester at JOYCE—the end of her second year in a three-year program—Ms. Thomson requested accommodation to extend the examination period for one day due to the extremely compressed schedule.  Ms. Thomson had to take three exams in two days.  Ms. Thomson had made repeated requests to JOYCE to adjust her schedule since the beginning of the semester.  Ms. Thomson informed JOYCE that, because of her disability, the compressed schedule could exacerbate her POTS symptoms.  JOYCE denied Ms. Thomson's request on the basis that it "wouldn't be fair to" other students (who had no disability) in a similar situation and

stated that "Extending the days for exams is not an ADA accommodation that Joyce University grants."

30.     In September 2022, JOYCE involved their external legal counsel, Mr. Darren Reid of HOLLAND & HART LLP to communicate with Ms. Thomson and her representative.   All communication had to go through Mr. Reid, resulting in extreme delays in any type of communication.

31.     The communication relay through Mr. Reid was in place until October 26, 2023, after Mr. Reid's email releasing Ms. Thomson and her representatives from relaying basic communications to JOYCE through Mr. Reid, JOYCE's external legal counsel.

32.     In November 2022, students in the same class as Ms. Thomson were afforded an opportunity to select their clinical placement schedule, but Ms. Thomson was not given that opportunity.  JOYCE informed Ms. Thomson that only "normal students" can schedule their clinic placements and because Ms. Thomson was an "ADA student," she was not allowed to make her own schedule.

33.     Ms. Thomson repeatedly requested reasonable accommodation related to excused absence and examination accommodation since at least April 2022.  JOYCE denied most of them.

34.     After JOYCE denied her request for examination accommodation, Ms. Thomson requested JOYCE to reconsider its decision.  In January 2023, JOYCE informed her that the Provost Council of JOYCE upheld JOYCE's decision to deny accommodation and informed her that there was no appeal/grievance process from that decision.

35.     In January 2023, the Chief of Staff of JOYCE, Ms. Heather Bailey, told Ms. Thomson that JOYCE bends over backward to accommodate Ms. Thomson; that Ms. Thomson

has been ungrateful; and that any excused absence on testing or accommodations beyond the minimum would be based upon the relationships Ms. Thomson cultivated with her professors. Ms. Bailey also stated that Ms. Thomson would never be satisfied and implied that Ms. Thomson was a burden to JOYCE. Additionally, Ms. Bailey, after admitting that she had little knowledge of ADA, insisted that JOYCE's policies sufficiently complied with ADA. And Ms. Thomson would have to work within that framework.

36.     Ms. Bailey asked Ms. Thomson to prepare specific examples of how JOYCE's existing policies were inadequate and present those examples to the Dean of Nursing. On January 17, 2023, Ms. Thomson's scheduled meeting with JOYCE's Dean of Nursing for that purpose was canceled after Ms. Thomson showed up at the meeting with her legal counsel.

37.     To date, JOYCE repeatedly failed to provide Ms. Thomson an opportunity to have a constructive and/or interactive conversation regarding accommodation.

38.     On February 15, 2023, JOYCE finally provided an updated accommodation letter to Ms. Thomson, allowing one extra absence, with additional absences to be reviewed, and examination accommodation and exam extension only after hospitalization.

39.     JOYCE denied Ms. Thomson's requests to adjust her clinical scheduling, by falsely claiming that she chose her schedule. However, as explained above, JOYCE only allowed "normal students" to pick their schedules. Because Ms. Thomson was an "ADA student," JOYCE picked her schedules.

40.     The clinical schedules that JOYCE assigned to Ms. Thomson had conflicts with her classes and labs. It resulted in increased stress on Ms. Thomson and exacerbated her disability.

41.     On February 20, 2023, Ms. Thomson met with JOYCE's clinical liaison and the Vice President of Human Resources at St. Mark's Hospital in advance of her clinical placement at St. Mark's Hospital to discuss St. Mark's questions and concerns related to Ms. Thomson's service dog, Daisy.  During that meeting, business cards were handed to Ms. Thomson and the VP of St. Mark's even gave Ms. Thomson her cell phone number and indicated to Ms. Thomson that she could reach out to the VP with any issues because such accommodation was new to them. JOYCE's clinical liaison was present and did not inform Ms. Thomson or St. Mark's that JOYCE prohibits JOYCE students from contacting JOYCE's partners—an issue JOYCE raised much later, without providing clarification or documentation.

42.     On February 22, 2023, Ms. Thomson started her clinical at St. Mark's Hospital and completed her 10-hour shift without any incident.

43.     On February 23, 2023, Daisy was diagnosed with a partially ruptured eardrum caused by an ear infection and had vestibular issues.

44.     On February 28, 2023, Ms. Thomson attended her clinical at St. Mark's Hospital without Daisy because Daisy could not work due to the ear infection and a ruptured eardrum.

45.     As prescribed by her physicians, Ms. Thomson could work without Daisy. However, on that day, approximately 6-7 hours into her shift, Ms. Thomson felt unwell, and her POTS symptoms began to flare up.  Ms. Thomson messaged the JOYCE instructor for her group, Mr. Eric West, several times to speak urgently in person.  Mr. West denied Ms. Thomson's request to go home early, stating that she only had three hours left for her shift and that she would be marked as absent if she left.

46.     With the stress of his refusal, Ms. Thomson's symptoms worsened. It was an avoidable event had JOYCE provided reasonable accommodation.

47.     On March 7, 2023, St. Mark's Hospital's VP of HR and Head of Risk Management sought Ms. Thomson out on the floor where she worked and started questioning Ms. Thomson about her private medical condition and her disability, which exceeded the scope of questioning permissible under the ADA. See, 28 CFR § 35.136. The questioning was done in front of the entire crew (nurses, a pharmacist, and another student) and forced Ms. Thomson to divulge her personal medical information in front of her peers.

48.     The VP of HR and the Head of Risk Management again left their business cards with Ms. Thomson and told her to call them when needed.

49.     Ms. Thomson was very upset with and intimidated by how St. Mark's Hospital handled the situation and questioned her ADA-related condition in front of her peers. Ms. Thomson requested JOYCE to find an alternate site for her clinicals for the remaining semester. The Clinical Liaison of JOYCE indicated that he would do his best to make it happen.

50.     On March 9, 2023, JOYCE denied Ms. Thomson's request for an alternate clinical site. JOYCE's reason for denying Ms. Thomson's request was that St. Mark's did not mean to cause increased stress.

51.     Ms. Thomson then reached out to the floor manager at St. Mark's Hospital for the floor where she worked to inquire whether there were concerns about her service dog. The Manager was not present during the March 7 incident. The Manager scheduled a meeting with St. Mark's VP of HR and the Head of Risk Management for March 13, 2023 to discuss the matter.

52. On March 10, 2023, JOYCE's Assistant Vice Present of Student Affairs, Ms. Michelle Richards, issued a verbal warning to Ms. Thomson, claiming that Ms. Thomson had set up a meeting with St. Mark's Hospital and indicated to Ms. Thomson that she was not allowed to talk to St. Mark's personnel. Ms. Thomson explained to JOYCE that Ms. Thomson did not set up the meeting with St. Mark's administrators, but JOYCE did not retract the issued warning.

53. On March 13, 2023, JOYCE informed Ms. Thomson that she was to attend the meeting with St. Mark's Hospital VP of HR and Head of Risk Management, as previously scheduled. Ms. Thomson requested her disability advocate be allowed to attend by phone. The request was denied. Ms. Richards, JOYCE's Assistant Vice Present of Student Affairs, also attended the meeting. In the meeting, Ms. Richards indicated that it was okay for Ms. Thomson to reach out to St. Mark's Hospital administrators, despite the verbal warning issued by JOYCE. The verbal warning was issued under Ms. Richards' name.

54. On March 14, 2023, Daisy was still sick. Ms. Thomson emailed JOYCE's ADA coordinator, who then emailed Ms. Richards. requesting clarification if she would be excused from attending the clinical. JOYCE informed Ms. Thomson that she would be marked as absent if she did not attend. Ms. Thomson attended her clinical with Daisy still quite ill.

55. On March 16, 2023, Ms. Thomson's legal counsel sent a demand letter to JOYCE requesting reasonable accommodation for absence policy, examination accommodation, and clinical placement and scheduling. The demand letter also warned JOYCE that Ms. Thomson would pursue legal remedies, available to her, such as filing a complaint with the Department of Education's Office of Civil Rights.

56.     On March 20, 2023, Daisy was so sick that Ms. Thomson had to take her for an emergency veterinary visit at night.

57.     On the morning of March 21, 2023, Ms. Thomson emailed JOYCE's ADA coordinator to inform her of the situation with a doctor's note stating that Ms. Thomson was fit for work without Daisy.  Ms. Thomson requested a shortened shift as a reasonable accommodation. The ADA coordinator referred Ms. Thomson's email to Ms. Richards.

58.     Ms. Richards rejected Ms. Thomson's request for a shortened shift without explanation and attached JOYCE's absence policy, stating that it would be Ms. Thomson's second absence.

59.     As Ms. Thomson was still in class at that time, she asked her disability advocate, Ms. Joey Ramp, to ask Ms. Richards for clarification.  Ms. Ramp requested Ms. Richards to clarify whether "Maria is not allowed to attend her clinical (be on site) for any reason if Daisy is not with her or . . . if Daisy is ill and Maria can only attend a 5-hour shift then she would need to take an absence?" Ms. Richards did not clarify and stated only that "Joyce University's legal team is reviewing this email along with other emails received from Maria's Team and will respond accordingly."

60.     Without clarification from JOYCE, Ms. Thomson reported to her clinical session at St. Mark's Hospital without Daisy.  Ms. Thomson was prepared to complete her entire 10-hour shift on that day.  JOYCE's clinical instructor, Ms. Johnson led Ms. Thomson to her clinic nursing floor and asked her to be placed with a nurse.  A few minutes later, Ms. Johnson returned and informed Ms. Thomson that Ms. Winter, JOYCE's Program Chair for clinical education, had instructed her not to allow Ms. Thomson in for her clinical that day.

61.     As Ms. Thomson and Ms. Johnson were leaving, they encountered the floor manager of St. Mark's Hospital, who invited them to her office to discuss the situation. While the floor manager of St. Mark's Hospital, Ms. Thomson, and Ms. Johnson were meeting, Ms. Winter called Ms. Johnson. After the call, Ms. Johnson informed Ms. Thomson that she cannot be there at St. Mark's Hospital because Ms. Thomson was a "liability" due to her February 28 POTS flare episode—the first time that JOYCE administration ever mentioned the episode to Ms. Thomson.

62.     Ms. Winter arrived at St. Mark's Hospital to escort Ms. Thomson out of the building, claiming that Ms. Thomson's showing up at St. Mark's violated a direct order. Ms. Thomson explained that Ms. Richards' email was unclear as to whether Ms. Richards was denying Ms. Thomson's request for a shortened shift or prohibiting Ms. Thomson from attending clinicals without her service dog. Ms. Thomson was prepared for a full shift on that day. Ms. Winter rebuffed her. Ms. Thomson left St. Mark's Hospital.

63.     The entire situation was completely avoidable if JOYCE had clear guidance on its policies and provided reasonable accommodations. JOYCE did not inform St. Mark's Hospital regarding its decision. Although Ms. Thomson submitted a doctor's note to JOYCE supporting that Ms. Thomson could function without Daisy, JOYCE did not communicate it to St. Mark's Hospital.

64.     Under no circumstance had JOYCE discussed with Ms. Thomson what to do when something occurred to her service dog.

65.     On March 23, 2023, JOYCE's external legal counsel, Mr. Reid, sent Ms. Thomson a letter informing Ms. Thomson that she was dismissed by JOYCE, effective immediately. The letter cited three alleged violations of the student code of conduct. "1). Insubordination to faculty

or administration including using abusive, foul, or threatening language toward students, faculty, or administration, 2). Conduct contrary to the best interests of the University or that reflects poorly on the University or affiliated clinical, or fieldwork site, 3). violating safety requirements or building regulations at Joyce University including clinical/fieldwork sites." Ms. Thomson disputes each of these allegations. In fact, the alleged "threatening language" was referring to Ms. Thomson asserting her civil rights by warning JOYCE that she would file an OCR complaint and other available legal actions. It is worth pointing out that none of JOYCE's allegations were related to Ms. Thomson's academic performance.

66.     In the same letter, JOYCE denied Ms. Thomson's ADA accommodation requests outlined in her legal counsel's demand letter dated March 16, 2023.

67.     On March 25, 2023, Ms. Thomson timely submitted a Student Appeal Form to JOYCE to appeal the dismissal decision in accordance with JOYCE's procedural rules. To date, JOYCE had not responded to Ms. Thomson's appeal.

68.     Since March 21, 2023, Ms. Thomson has not been allowed to attend the nursing program due to JOYCE's unlawful actions. JOYCE's exclusion of Ms. Thomson is present and ongoing.

69.     The harm caused by Defendant is irreparable and can only be mitigated by the reinstatement of Plaintiff in good standing in the nursing program.

**CAUSE OF ACTION**

70.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs and incorporates the same herein by reference.

71.     Plaintiff brings this action under Title III of the ADA, 42 U.S.C. §12182, *et seq*. (2002); and the Rehabilitation Act 29 U.S.C. § 794, *et seq*. (2011).

72.     Title III of the ADA prohibits private entities providing public accommodations, such as JOYCE, from discriminating against a person with a disability because of her disability by denying her the opportunity to participate in or benefit from the services, privileges, advantages, or accommodations of the entity.   42 U.S.C. § 12182(b)(1)(A); 28 C.F.R. § 36.202(a).   Ms. Thomson is a person with disabilities as defined by the ADA.

73.     Title III of the ADA expressly lists "a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education" as a public accommodation.  42 USCA § 12181 (7)(J).  Title III of the ADA requires public accommodations to make reasonable modifications in policies, practices, and procedures that deny equal access to individuals with disabilities, unless it would cause a fundamental alteration in the nature of the goods and services provided.  28 C.F.R. § 36.302

74.     Under the ADA, no person is permitted to discriminate against an individual because they assert their rights under the ADA, nor can any person coerce, intimidate, threaten, or interfere with any individual to exercise or enjoy their rights under the ADA. 28 C.F.R. § 36.206.

75.     Under the Rehabilitation Act, "an entire corporation, partnership, or other private organization" is a covered "program or activity," if they "principally engaged in the business of providing education" or receive Federal funds.  29 U.S.C. § 794(b)(3)(A).

76.     The Rehabilitation Act prohibits discrimination on the basis of disability by any covered program or activity. 29 U.S.C. § 794.  Discrimination under the Rehabilitation Act includes a covered entity, in providing an "aid, benefit, or service," denying a qualified individual

with a disability "the opportunity to participate in or benefit from the aid, benefit or service." 34 C.F.R. § 104.4(b)(1)(i) (2012). Covered entities also must not provide those aids, benefits, or services to qualified individuals with disabilities in a manner that is not equal to or as effective as that provided to others. *Id*. at §§ 104.4(b)(1)(ii)-(iii). Covered entities must not otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, or opportunity enjoyed by others. *Id*. at § 104.4(b)(1)(vii).

77.     As described, *supra*, Defendant denied Ms. Thomson access to their services solely on the basis of her disability. Defendant has also failed to modify their policies and procedures to avoid discrimination against Ms. Thomson. *Id*. at § 104.44. Any educational services being provided to Ms. Thomson are not equal to or as effective as that provided to others, and she is not being served in the most integrated setting appropriate.

78.     As described, *supra*, Defendant through their external legal counsel, Chief of Staff, Assistant Vice President, and Nursing Program Chair, intimidated Ms. Thomson merely because she asserted her rights under the ADA and Rehabilitation Act.

79.     Because Defendant refused to modify their policies for Ms. Thomson and denied her full and equal access to its school based solely on her disability, they have violated Title III of the ADA and the Rehabilitation Act.

80.     Ms. Thomson, despite her disability, is completely able to attend Defendant's school and programs safely. Defendant's denial of access and failure to accommodate, solely on the basis of Ms. Thomson's disability, constitutes intentional disability-based discrimination.

81.     Defendant dismissed Ms. Thomson from its program in retaliation to her asserting her rights under the ADA and Rehabilitation Act.

82.     Defendant's conduct, described above, was intentional and taken in reckless disregard of the rights afforded Plaintiff under the ADA and Rehabilitation Act.

## Count I

### (Failure to Modify Policies, Practices, or Procedures in Violation of the ADA)

83.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs and incorporates the same herein by reference, and further alleges as follows:

84.     Pursuant to Title III of the ADA, Defendant is required to make reasonable modifications to policies, practices, or procedures when such are necessary to avoid discrimination, unless such criteria can be shown to "fundamentally alter the nature of the service, program, or activity. 28 C.F.R. § 36.302.

85.     Defendant's refusal to modify their policies, practices, or procedures prevents Ms. Thomson from accessing their educational services.  The requested modifications by Ms. Thomson, if granted, would not constitute a fundamental alteration of those services.  Defendant's actions resulted in discrimination based on Ms. Thomson's disabilities, in violation of Title III of the ADA and implementing regulations.

## Count II

### (Denial of Access in Violation of the ADA)

86.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs and incorporates the same herein by reference, and further alleges as follows:

87.     Title III of the ADA prohibits entities, such as JOYCE, from discriminating against a person with a disability because of her disability by denying her the opportunity to participate in or benefit from the services, programs, or activities of the entity. 42 U.S.C. § 12182.

88.     Defendant's refusal to allow Ms. Thomson to access its nursing education program because of her disability discriminates against her by denying her the opportunity to participate in and benefit from the educational services Defendant offers, in violation of the ADA and implementing regulations.

## Count III

**(Failure to Provide Services in the Most Integrated Setting Appropriate to Ms. Thomson's Needs in Violation of the ADA)**

89.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs and incorporates the same herein by reference, and further alleges as follows:

90.     "A public accommodation shall afford goods, services, facilities, privileges, advantages, and accommodations to an individual with a disability in the most integrated setting appropriate to the needs of the individual." 28 C.F.R. § 36.203(a).

91.     "Notwithstanding the existence of separate or different programs or activities provided in accordance with this subpart, a public accommodation shall not deny an individual with a disability an opportunity to participate in such programs or activities that are not separate or different." 28 C.F.R. § 36.203(b).

92.     "Nothing in this part shall be construed to require an individual with a disability to accept an accommodation, aid, service, opportunity, or benefit available under this part that such individual chooses not to accept." 28 C.F.R. § 36.203(c)(1).

93.     Defendant's insistence that Ms. Thomson cannot attend clinical without her service dog, Daisy, because of their denial of Ms. Thomson's requested modification to JOYCE's absence policy is a failure to administer service to her, as a qualified individual with a disability, in an

integrated setting and/or in the most integrated setting appropriate to her needs, in violation of Title III of the ADA and implementing regulations.

## Count IV

### (Retaliation in Violation of the ADA)

94.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs and incorporates the same herein by reference, and further alleges as follows:

95.    It is unlawful for a public or private entity to retaliate against any person who asserts their own or another's rights under the ADA, or who opposes any violation of such rights under the ADA. 42. U.S.C. § 12203(a).

96.    By dismissing her from the nursing program; instigating student conduct code violation citations; and restricting her to attend clinicals only in the accompany of her service dog, Defendant retaliated against Ms. Thomson for her ADA-protected attempts to ensure reasonable ADA accommodations.

## Count V

### (Interference, Coercion & Intimidation in Violation of the ADA)

97.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs and incorporates the same herein by reference, and further alleges as follows:

98.    It is unlawful for a public or private entity or any person to coerce, threaten, intimidate, or interfere with any person in the exercise or enjoyment of their rights under the ADA. 42 U.S.C. § 12203(b).

99.    By instigating student conduct code violation citations; designating external legal counsel for all communications; restricting her to attend only in the accompany of her service dog;

and prohibiting her from communicating with St. Mark's Hospital, Defendant engaged in intimidation and coercion in an attempt to intimidate Ms. Thomson from asserting her rights under the ADA.

## Count VI

### (Denial of Participation in Education Services in Violation of the Rehabilitation Act)

100.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs and incorporates the same herein by reference, and further alleges as follows:

101.    Under the Rehabilitation Act, a covered entity, like JOYCE, must not deny a qualified individual "the opportunity to participate in or benefit from the aid, benefit or service" they provide. 34 C.F.R. § 104.4(b)(1)(i).

102.    Defendant has refused Ms. Thomson the opportunity to participate in, and to fully and equally benefit from, its educational services by dismissing her from the nursing program solely on the basis of her disability in violation of the Rehabilitation Act and implementing regulations.

## Count VII

### (Providing Unequal and Less Effective Educational Services in Violation of the Rehabilitation Act)

103.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs and incorporates the same herein by reference, and further alleges as follows:

104.    The Rehabilitation Act prohibits a covered entity, like JOYCE, from providing aids, benefits, or services to qualified individuals with disabilities in a manner that is not equal to or as effective as that provided to others. Id. at §§ 104.4(b)(1)(ii)-(iii).

105. Because of her disability, Defendant has required Ms. Thomson to receive educational services in a segregated, restrictive, and completely isolated setting, as compared to the services provided to Ms. Thomson's non-disabled peers (the "normal students" vs Ms. Thomson as the "ADA student," as JOYCE described). These services are inherently unequal to and obviously inferior to and less effective than those provided to other students without disabilities, which violates the Rehabilitation Act and implementing regulations.

## DECLARATORY RELIEF

106. This action seeks declaratory relief pursuant to 28 U.S.C. § 2201 (2011) for the purpose of determining a question of actual controversy between Plaintiff and Defendant.

107. Plaintiff, Ms. Thomson, is entitled to a declaratory judgment concerning each of Defendant's violations of the ADA and implementing regulations, as well as their violations of the Rehabilitation Act and implementing regulation and specifying Ms. Thomson's rights with regard to Defendant's services and facilities.

## INJUNCTIVE RELIEF

108. This action seeks injunctive relief pursuant to 42 U.S.C. § 12188 and Rule 65 of the Federal Rules of Civil Procedure.

109. Plaintiff is entitled to a permanent injunction requiring Defendant to correct each of their violations of the ADA, Rehabilitation Act, and their implementing regulations as such relate to Plaintiff, and should also be enjoined from any further discriminatory exclusion or retaliation of Plaintiff from their school system and services.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a jury trial for all issues in this matter.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enters judgment against Defendant as follows:

A. Declaratory judgment on behalf of Plaintiff, declaring that Defendant's actions are in violation of Title III of the ADA, Section 504 of the Rehabilitation Act, and their implementing regulations;

B. Permanent mandatory injunction ordering Defendant to cease its exclusion of Ms. Thomson from its school, ordering Defendant to grant Ms. Thomson's requested modification and to accommodate Ms. Thomson's disability, and ordering Defendant to cease its exclusion of Ms. Thomson and other disabled persons from participation or benefits of services and activities when the exclusion or denial occurs by reason of such disability;

C. All costs and attorney's fees expended herein and assess all such costs against Defendant; and

D. Such other and further relief as may be deemed just, equitable, and appropriate by the Court.

DATED: June 19, 2023

HEPWORTH LEGAL

/s/      *RunZhi Lai*
Dustin Clark
Run-Zhi "RZ" Lai
**Attorneys for Plaintiff**