# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| MARIA THOMSON, <br><br> Plaintiff, <br><br> v. <br><br> AMERITECH COLLEGE LLC D/B/A JOYCE UNIVERSITY OF NURSING AND HEALTH SCIENCES, <br><br> Defendant. | **MEMORANDUM DECISION AND ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION** <br><br> Case No. 2:23-CV-397-HCN <br><br> Howard C. Nielson, Jr. <br> United States District Judge |

Plaintiff, Maria Thomson, brings this action against Ameritech College, which does business as Joyce University of Nursing and Health Sciences, asserting that Joyce discriminated against her on the basis of her disability. Ms. Thomson requests a preliminary injunction (1) reinstating her in Joyce's nursing program and (2) ordering Joyce to provide her with certain specified accommodations. *See* Dkt. No. 5. After carefully considering the parties' submissions and holding an evidentiary hearing, the court denies Ms. Thomson's request.

## I.

It is undisputed that Ms. Thomson suffers from "an autonomic nervous system disorder, complicated by Postural Orthostatic Tachycardia Syndrome"—commonly referred to as POTS. Dkt. No. 5-1 ¶ 4. And at least for purposes of this motion, Joyce does not dispute that this condition constitutes a disability within the meaning of the Americans with Disabilities Act.

POTS is a "syndrome of circulatory insufficiency . . . due to impaired response by the autonomic nervous system when an individual is standing upright." Dkt. No. 5-2 ¶ 5.

> This response causes an increase in heart rate, often to a rate greater that 120 beats per minute when just being upright, indicating that the cardiovascular system is working hard to maintain blood pressure and blood flow to the brain. The primary

> symptoms of POTS when upright are dizziness, lightheadedness, palpitations, generalized weakness, shakiness, fatigue, headaches, sweating, anxiety, and difficulty concentrating.

*Id.* Because the symptoms are triggered by being upright, the "lightheadedness and fainting are relieved by laying down again; in many cases sitting or crouching down on the floor can also alleviate symptoms. The symptoms are unpredictable, and each case is unique. Symptoms usually become worse after exposure to heat, stressors, excitement, or physical activity." *Id.* In Ms. Thomson's case, "her heart rate may increase rapidly with standing or prolonged sitting." *Id.* ¶ 6.

"One of the primary ways [Ms. Thomson] manages her disability is with the help of her service dog, Daisy." *Id.* ¶ 12. Daisy has been trained to warn Ms. Thompson when she is experiencing POTS symptoms. *See* Dkt. No. 5-3 ¶ 7. Daisy's breed has "an estimated 220 million scent receptors in comparison to our approximate 6 million in the nasal cavity," and "Daisy has been scent trained to give a behavior (alert) when the adrenal gland starts sending adrenaline through the body due to heart rate spikes." *Id.* ¶ 9. Daisy provides these alerts by nudging with her nose Ms. Thomson's leg or waist area. *See id.*; Dkt. No. 26 at 100:21–23. These alerts warn Ms. Thomson that she should "sit and let her body self-regulate." Dkt. No. 5-3 ¶ 10.

Daisy is not the only way Ms. Thomson manages her POTS, however. She also has an implanted central IV line to receive IV fluids, takes medications, and makes certain lifestyle changes, such as increasing her fluid intake and wearing a watch that monitors her heart rate. *See* Dkt. No. 5-2 ¶¶ 14, 17. In addition, when she enrolled in nursing school, Ms. Thomson engaged the help of Joey Ramp-Adams, a disability advocate, who has "acted as an advisor, advocate, and liaison on [Ms. Thomson's] behalf regarding disability accommodations for her in nursing programs with a focus on accommodating her as a service dog handler." Dkt. No. 5-4 ¶ 4; *see also* Dkt. No. 5-5 ¶ 3.

In January 2022, Ms. Thomson transferred to the RN/BSN nursing program at Joyce, *see* Dkt. No. 5-5 ¶ 2, "a private, accredited institution of higher education located in Draper, Utah," that specializes in educating health care professionals, Dkt. No. 20-1 ¶ 4. Ms. Thomson entered Joyce as a second-year nursing student. *See* Dkt. No. 5-5 ¶ 2.

Upon enrollment, Ms. Thomson requested the following accommodations for her disability: "additional time for tests and quizzes, a quiet testing space and the presence of a service dog." Dkt. No. 20-2 at 9. On January 4, 2022, Kelsi Cottreli, who was to serve as Ms. Thomson's Academic Advisor during her enrollment at Joyce, informed Ms. Thomson that the University had approved all three accommodations, though Ms. Cottreli clarified that the "service dog accommodation [would] need to be reviewed prior to the beginning of each semester during [Ms. Thomson's] program." *Id.*

On March 15, 2022, Joyce approved Ms. Thomson's further request to have two-days' additional time to complete assignments "on a case-by-case basis." *Id.* at 11. And on April 21, 2022, Joyce re-approved Ms. Thompson request for "[u]se of a service animal in all classes, lab, [and] SCE," although it explained that "[c]linicals will be determined by location." *Id.* at 13.

But Ms. Thomson was unsatisfied with these accommodations alone and felt that her health was endangered by what she characterized as Joyce's "rigid one-absence policy." Dkt. No. 5-5 ¶ 4. At that time, Joyce's absence policy for all students was that each student had one "free absence" per semester that would allow that student to miss a class, lab, or clinical session without providing any documentation or excuse. Dkt. No. 26 at 176 (176:8–11). Additional absences were permitted only if the student provided documentation showing extenuating circumstances. *See id.*

3

According to Mykel Winter, Joyce's Program Chair of Nursing Clinical Education, extenuating circumstances that could justify additional absences included "medical absences, illnesses, COVID, your child's in the ER. Something that is actually extenuating, a life emergency that you are able to provide that supporting documentation for." *Id.* at 175 (175:7-10). Once documentation was submitted, Joyce's Dean, Associate Dean, or Program Chair would review the documentation and either approve or deny the request for an excused absence. *See id.* at 175 (175:11-13). Michelle Richards, Joyce's Assistant Vice President of Student Affairs, explained that there was no "cap on how many attendance exceptions or documentation somebody can submit, they just submit them as they occur and the clinical team reviews them and approves them or denies them." *Id.* at 162 (162:15-18). If Joyce ultimately determined that an additional absence was not excused, the student would be withdrawn from the class, lab, or clinic that the student had missed. *See* Dkt. No. 20-1 at 49; Dkt. No. 20-2 at 19.

According to Ms. Thomson, not knowing in advance whether a disability-related absence would be "excused" caused her such severe anxiety that she "delayed seeking treatment for possible infections, jeopardizing [her] health and safety." Dkt. No. 5-5. ¶ 4. Ms. Thomson represents that on one occasion, when she was hospitalized for an infection, she had Ms. Ramp-Adams contact Joyce on her behalf. *See id.* In her declaration, Ms. Thomson stated, "even then, the school refused to provide assurance that [her] absences would be excused" and that this particular absence "was never excused and counted as [her] one [free] absence for that semester." *Id.* Ms. Thomson does not represent that she submitted documentation relating to this absence, however.[1]

---

[1] Even had Ms. Thomson submitted documentation, there is no reason this absence would not have counted as her "free" absence. By its terms, Joyce's attendance policy appears to have

4

Frustrated with the absence policy in particular, Ms. Thomson engaged legal counsel to advocate on her behalf. *See id.* ¶ 5. On February 14, 2023, Joyce University responded to Ms. Thomson's concern by granting her another accommodation: one extra "free absence" in addition to the one already provided by the ordinary attendance policy, with further absences to be reviewed on a case-by-case basis if they were supported by documentation as required under the attendance policy. *See* Dkt. No. 20-2 at 16; Dkt. No. 5-5 ¶ 5. Joyce also agreed to extend the deadlines for exams if Ms. Thomson were hospitalized during an exam period. *See* Dkt. 20-2 at 16. Joyce approved multiple other accommodations requested by Ms. Thomson as well, allowing her to (1) "leave classroom for access to restroom, medications, and any other health treatments," (2) have a "water bottle in class to maintain hydration," and (3) use "compression over extremities or abdomen to achieve upright exercise consistently." *Id.* at 15.

During the third year of her nursing program, Ms. Thomson was required to participate in rotations at one of Joyce's clinical partners. Joyce's catalog explains that "[c]linical arrangements are made based on clinical site eligibility requirements, program of study and other considerations. While the institution seeks to work with individual students, they are expected to be flexible." Dkt. No. 20-1 at 47. The catalog further explains that the "[a]vailability of clinicals or fieldwork may be limited" and that Joyce "cannot guarantee availability of placements or the time, location, or identity of placements." *Id.*

---

allowed each student one absence per semester, regardless of the reason for that absence. While *additional* absences could be excused if a student provided documentation, nothing in Joyce's attendance policy suggests that an absence supported by documentation would not count as the student's "free" absence. While the attendance policy no doubt relaxed the strict requirement that a student submit documentation justifying each absence for the student's first absence per semester, nothing before the court suggests that a student's "free" absence was intended only for circumstances that did not justify missing school, let alone that it was reserved for such circumstances.

Christopher Stanley, Joyce's Clinical Relations Manager, was responsible for finding Ms. Thomson's clinical placement for the spring 2023 semester. This "was a challenge because of Ms. Thomson's requirement that she be permitted to take her service dog ('Daisy') to her clinical rotations." Dkt. No. 20-3 ¶ 4; *see also* Dkt. No. 26 at 135 (135:9–16). Mr. Stanley found only one hospital among Joyce's clinical partners that would accept a nursing student with a service animal and would "also fit Ms. Thomson's training requirements." Dkt. No. 20-3 ¶ 5. This was St. Mark's Hospital. *See id*.

Ms. Thomson began attending her clinical rotation at St. Marks with Daisy in early February of 2023. Dkt. No. 5-5 ¶ 9. At first things went well. But later that month, "Daisy was diagnosed with a partially ruptured eardrum caused by an ear infection and had vestibular issues." *Id*. As a result, Ms. Thomson attended her shift at St. Mark's without Daisy on February 28, 2023. *See* Dkt. No. 26 at 39–40 (39:25–40:4).

Midway through her shift, Ms. Thomson noticed that she was shaking while placing an IV bag, which signaled that her POTS "was getting bad." Dkt. No. 26 at 66 (66:17–24). She felt it was no longer safe for her to perform "hands-on patient care" given her deteriorating physical state. *Id.* at 67 (67:11–20). She accordingly sent a text message to Eric West, a Joyce University clinical instructor, saying, "Hey, can you please come down, I need to talk to you." *Id.* at 66–67 (66:23–67:1). After a half hour passed with no response, she texted him again, this time saying, "Hey, I heard you've been down here once. Can you come back? I really need to talk to you." *Id.* at 67 (67:2–6). Finally, one hour later, Mr. West and Carrie Fischer—another clinical instructor— came to the unit where Ms. Thomson was working while making their usual rounds. *See id* at 67, 185–186 (67:21–23, 185:7–186:1).

When Mr. West and Ms. Fischer arrived, Ms. Thomson was visibly upset and unwell. *See id*. at 105, 185 (105:5–9, 185:7–12). She asked to go home. *See id.* at 67–68 (67:24–68:3). Ms. Fischer spoke to the nurses working at the unit to better understand what had happened during Ms. Thomson's shift. When Ms. Fischer returned from that conversation, she found Ms. Thomson "down on the floor, curled up, shaking, sweating, crying." *Id.* at 105 (105:7–9). Ms. Fischer got down on the floor with Ms. Thomson and tried to help her calm down by "rubbing her back and having her do breathing exercises." Dkt. No. 20-4 ¶ 5.

When Ms. Fischer would try to get Ms. Thomson to stand up, Ms. Thomson would "panic, shake, sweat and start crying all over again." *Id.* "After approximately ten minutes," Ms. Fischer "informed Ms. Thomson that she had to get up due to her being a danger to other patients and staff members" because she was lying just outside the trauma room in the Emergency Department. *Id.* Ms. Fischer and Mr. West were eventually able to move Ms. Thomson to a quieter area. *Id.* At that point, Ms. Fischer decided to allow Ms. Thomson to leave her shift early. *Id.* Upon hearing this news, Ms. Thomson quickly "re-gained her composure" and "assured [them] she was calm enough to drive" home. *Id.* Ms. Fischer then told Ms. Thomson that in the future she "cannot attend clinical without her service dog." *Id.* ¶ 6.

Ms. Thomson now claims Ms. Fischer never said this. *See* Dkt. No. 26 at 45 (45:16–19). But Ms. Fischer's account of the incident is corroborated on this point by Mr. West, who stated in his declaration as follows:

> I was present on February 28, 2023 when Carrie Fischer told Ms. Thomson, in no uncertain terms, that Ms. Thomson was required to have her service animal with her at all times. Ms. Fischer told Ms. Thomson that she did not want Ms. Thomson to have another episode where she became the patient instead of the student in training, and that not having her dog with her was a serious safety issue.

Dkt. No. 20-5 ¶ 6. The court credits the testimony of Ms. Fischer and Mr. West on this point.

7

Mr. West further explained that

> Ms. Fischer told Ms. Thomson that if she had an incident or episode, which we were later informed was hyperadrenergic POTS, without the dog present and the patient under Ms. Thomson's care had a serious issue (for example, 'coded'), the hospital would suddenly have two emergency patients to deal with instead of one.

*Id.* ¶ 7.

Ms. Thomson sent the following email to Mr. West and Ms. Fischer after the February

28th incident explaining what had happened:

> Hi Carrie and Eric,
>
> I owe you both an explanation and apology for what happened on Tuesday. . . .
>
> I honestly never imagined being at clinical without Daisy (if I knew far in advance and majorly prepped for this I can see trying it but out of the blue like this absolutely not). I never in a million years thought this would happen.
>
> I have hyperadrenergic POTS. So in other words, my body doesn't properly distribute the blood inside me and as a result my brain tells my heart to pump harder, and faster and to dump adrenaline as if I am in fight or flight. These 'adrenaline dumps' lead to my body going into overdrive. . . . Unfortunately, this is exactly what you both got to witness. . . .
>
> By the time I saw you both, I was passed being able to will my body to function. I was running on fumes, and crashing. . . .
>
> Now for Daisy . . . . Daisy response to heart rate spikes, cortisol and adrenaline surges and anticipates these spikes and/or responds to them before they become debilitating. She is accurate in her job and would never let symptoms become as severe as the other night. Hence why when asked what I do in this situation, it's been so long since I have felt this I didn't know. . . .
>
> I knew going into this shift without Daisy that it would be a lot and I was nervous. However, I also know the school will never understand. Joyce clearly thinks of her as a bona fide pet that is difficult to accommodate instead of medical equipment. I know that they will never comprehend that she is as important as a glucose monitor, but for heart rate. In other word I knew I couldn't ask for this shift off.
>
> Despite how wonderful the day was, until it wasn't, it became apparent how crucial Daisy is.

> I wish I got to explain all this in advance. I am sorry this happened and I hope I
> get a chance to discuss some of this with you both in person.

Dkt. 20-4 at 7–8.

The next month, Ms. Thomson returned to her clinical rotation with Daisy. According to Joyce's Clinical Relations Manager, Christopher Stanley, issues arose between Ms. Thomson and St. Mark's HR and Safety personnel regarding Daisy. *See* Dkt. No. 20-3 ¶¶ 7–8. The St. Mark's personnel were concerned "about what job the dog was supposed to perform, how it detects medical issues, and how the dog was supposed to interact with Ms. Thomson." *Id.* ¶ 8. They also expressed concern by email to Mr. Stanley "that the dog be leashed at all times." *Id.*

On March 13, 2023, Mr. Stanley attended a meeting with Ms. Thomson and St. Mark's personnel to discuss

> whether Ms. Thomson could have private space to complete her charting, whether
> the dog could be crated, and [whether] the dog needed to be close to Ms.
> Thomson (within leash length), rather than allowing the dog to roam around or be
> locked in its crate without access to Ms. Thomson.

*Id.* ¶ 9. Mr. Stanley testified that when he left the March 13th meeting it was his understanding that "it would be required for [Ms. Thomson] to be present with Daisy when she is attending clinicals." Dkt. No. 26 at 144 (144:2–4). And as a follow up to that meeting, Mr. Stanley wrote an email, later forwarded to Joyce University's clinical instructors, explaining that Ms. Thomson's "service dog is to stay within arm's reach of Maria at all times while on shift . . . ." Dkt. No. 20-3 ¶ 10.

Within hours of the March 13th meeting, Ms. Thomson sent Mr. Stanley the following email:

> Hi CJ,
>
> Unfortunately, Daisy is sick. She got sick in the car after leaving St. Marks and
> became lethargic. I brought her to the vet where they ran some tests and told me
> to check back in tomorrow.

> Obviously, I cannot take the chance of having her be sick up on the unit (that's definitely the last thing we need at the moment). What do you want me to do in this type of situation? Based on the meeting today, I don't even know if the site will take me without her.
>
> Clinical is tomorrow so I need to know what you want me to do as soon as possible. Please let me know."

Dkt. No. 20-3 at 10. Mr. Stanley replied:

> Maria,
>
> Terribly sorry to hear Daisy isn't feeling well. I hope she has a speedy recovery and that the labs tell you what's going on.
>
> To process the clinical make-up, you need to have documentation of the extenuating circumstance for why you were unable to attend clinical and submit it to the clinical placement team email. The documentation will be reviewed and if approved, options will be provided for clinical makeup.

*Id.*

Ms. Thomson responded, "Thank you so much. This may sound ridiculous, but I have been saving my one absence for medical surgical lab on the 24th of March. I am going to a concert down in Vegas. Is this missing of lab going to affect my ability to do that?" *Id.* Mr. Stanley replied: "Excellent question Maria, but I'm not as familiar with lab and sim policy. I believe their policy is similar and accounts for extenuating circumstances, but I would suggest you speak with your lab instructor as they would know better than I." *Id.* at 9.

Mr. Stanley then connected Ms. Thomson with Ms. Richards, Joyce's Assistant Vice President of Student Affairs, who reminded Ms. Thomson of both the general absence policy and the fact that, as an accommodation for her disability, Ms. Thomson had been awarded one extra free absence in addition to the one provided by the general policy. *See id.* at 8. Ms. Richards explained that Ms. Thomson's absence the next day would count as "the one additional absence Joyce University granted to Ms. Thomson as an approved accommodation." Dkt. No. 20-6 ¶ 8. It appears that Ms. Thomson instead attended her clinical shift the next day with her service

animal, even though Daisy was compromised with a ruptured eardrum. *See* Dkt. No. 5-5 ¶ 16;

Dkt. No. 20-6 at 15.

One week later, on March 21, 2023, Ms. Thomson was scheduled for another clinical

shift at St. Mark's, which was to begin at 1:00 PM. *See* Dkt. No. 26 at 171 (171:20–22). But

Daisy was still sick. Ms. Thomson accordingly emailed Joyce at 10:28 AM to ask whether she

could work a partial shift without Daisy. *See* Dkt. No. 20-6 at 13. She wrote:

> I am writing to you because Daisy is still sick and trending in the wrong direction.  I had to bring her to the urgent care vet tonight, 3/20. I don't know if you heard, but we did go to clinical last week and while Daisy did her job like a professional it took a toll on her physically. Even though she is medical equipment, she is living and in order for me to remain successful I must take care of her.
>
> Due to this, she is not coming to clinical today, 3/21. While she is my main alert system as far as my disability goes, she isn't my only (reference Dr. note attached). However, I cannot make a 10-hour shift without her. Accordingly, I am requesting a policy modification as a reasonable accommodation: that I be permitted to attend for a 5 hour shift due to my disabilities.

*Id.* Ms. Richards promptly responded:

> In response to your request for a policy modification to complete a partial clinical shift, we are not able to approve this request at this time. If Daisy is unable to accompany you to your clinical shift you will need to follow the attendance policy and submit the appropriate documentation to the clinical team.
>
> I understand, last week, you did not use your approved accommodation of, 'allowed one additional absence above the attendance policy . . . .' Today's clinical absence will fall into this accommodation as your one additional absence above the attendance policy.

Dkt. No. 20-6 at 15.

Because Ms. Thomson was in class, she had Ms. Ramp-Adams send an email to Ms.

Richards to ask two follow-up questions. *See* Dkt. No 5-5 ¶ 18. First, "[w]hat would be the

reason why Joyce is not able to approve this request at this time?" Dkt. No. 5-6 at 3. Second,

> Are you saying that Maria is not allowed to attend her clinical (be on site) for any reason if Daisy is not with her or are you just saying that if Daisy is ill and Maria can only attend a 5-hour shift then she would need to take an absence?

*Id.* Perhaps because the email came from Ms. Ramp-Adams rather than from Mr. Thomson, Ms. Richards replied as follows: "Joyce University's legal team is reviewing this email along with the other emails received from Maria's team and will respond accordingly." *Id.* at 2.

Ms. Thomson proceeded to attend her clinical that day without Daisy. *See* Dkt. No. 5-5 ¶ 19. When she arrived, she began working with Lorene Johnson, a Joyce University clinical instructor, who was not aware that Ms. Thomson was not authorized to work without Daisy. *See* Dkt. No. 26 at 172–173 (172:24–173:2). But after Ms. Thomson was already on the floor, Ms. Johnson received a phone call from Ms. Winter, Joyce's clinical program chair, informing her of this restriction. *See* Dkt. No. 20-7 ¶ 4.

After receiving that phone call, Ms. Johnson "asked Ms. Thomson to accompany [her] to a private space where [she] told her that she was not permitted to fill her shift that day without her service dog." *Id.* According to Ms. Johnson, "Ms. Thomson was very angry and upset." *Id.* "She threatened to get her lawyers involved and sue Joyce University, and complained loudly about the situation in public areas of the hospital." *Id.* By that point, Ms. Winter was also present. She agreed that "Ms. Thomson was very disruptive in her conduct and behavior, complaining and speaking in a loud voice in the patient area," and that "Ms. Thomson publicly exclaimed she was going to sue Joyce University and St. Mark's." Dkt. No. 20-8 ¶ 18. Ultimately, Ms. Johnson escorted Ms. Thomson out of the hospital. *See* Dkt. No. 20-7 ¶ 4.

Following this incident, Joyce represents that it "determined that Ms. Thomson's decision to attend her clinical shift without her service animal constituted insubordination to faculty, reflected poorly on the University and St. Mark's, and presented serious violations of safety requirements (attending without her service animal), endangering not only herself but also St.

Mark's patients." Dkt. 20-1 ¶ 17. Joyce further represents that "[a]s a direct result of Ms. Thomson's conduct in disregarding Ms. Fischer's explicit instruction not to attend without her service animal," it "made the difficult but important decision to dismiss Ms. Thomson and terminate her student status with Joyce University." *Id.* ¶ 16.

Joyce explained that "Ms. Thomson's conduct and behavior was in direct violation of Joyce University's policies and its Student Code of Conduct, which provides that it is a violation of the Code to engage in 'insubordination to faculty or administration including using abusive, foul, or threatening language toward students, faculty, or administration.'" *Id.* Joyce further explained that "[i]t is also a violation to engage in conduct 'contrary to the best interests of the University or that reflects poorly on the University or affiliated clinical, or fieldwork site," and that "[t]he Code also prohibits 'violating safety requirements or building regulations at Joyce University including clinical/fieldwork sites.'" *Id.*

On March 25, 2023, Ms. Thomson submitted a Student Appeal Form, appealing her termination in accordance with Joyce's procedural rules. *See* Dkt. No. 5-8. Joyce denied Ms. Thomson's appeal on August 3, 2023. *See* Dkt. No. 20-1 ¶ 18.

Meanwhile, on June 19, 2023, Ms. Thomson brought suit in this court, alleging violations of Title III of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act. *See* Dkt. No. 1. On July 14, 2023, Ms. Thomson filed a motion seeking a temporary restraining order and a preliminary injunction. *See* Dkt. No. 5.

At a hearing on August 2, 2023, the court indicated that it would deny Ms. Thomson's request for a temporary restraining order but scheduled an evidentiary hearing on her request for

a preliminary injunction. *See* Dkt. No. 13.[2] The court held that hearing on September 12, 2023. *See* Dkt. No. 25. The facts recounted in this opinion reflect the court's findings and credibility determinations, based on the declarations and exhibits submitted by the parties and the testimony of their witnesses at the evidentiary hearing. *See* Fed. R. Civ. P. 52(a)(2).

## II.

"A preliminary injunction is an extraordinary remedy; it is the exception rather than the rule." *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984). It follows that a preliminary injunction "may only be awarded upon a clear showing that the [movant] is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

To obtain a preliminary injunction, the moving party must demonstrate four factors: "(1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tip in the movant's favor; and (4) that the injunction is in the public interest." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009). A "plaintiff's failure to prove any one of the four preliminary injunction factors renders its request for injunctive relief unwarranted." *Village of Logan v. U.S. Dep't of Interior*, 577 F. App'x 760, 766 (10th Cir. 2014).

The court concludes that Ms. Thomson has failed to demonstrate a likelihood of success on the merits. The court accordingly denies her request for a preliminary injunction without addressing the other preliminary-injunction factors.[3]

---

[2] To the extent that the court did not formally deny Ms. Thomson's request for a temporary restraining order at the August 2nd hearing, it now denies that request for the reasons stated on the record at that hearing, as well as those stated in this memorandum decision and order.

[3] The court rejects Joyce's argument that Ms. Thomson's claims are moot. That argument is based on the Tenth Circuit's unpublished decision in *Rhodes v. Southern Nazarene Univ.*, 554

14

**A.**

Ms. Thomson alleges that Joyce violated her rights under Title III of the ADA by (1) failing to provide reasonable accommodations and modifications to its policies, thereby denying her equal access to and participation in Joyce's nursing program, and (2) retaliating against her for exercising her rights under the ADA.[4] To receive a preliminary injunction, Ms. Thomson must show that she is "*likely* to succeed on the merits" of her underlying claims; demonstrating a mere "possibility" of success, or that there are "serious, substantial, difficult, [or] doubtful" questions "deserving of more deliberate investigation," will not suffice. *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281–82 (10th Cir. 2016) (emphasis added).

**B.**

The court will first address Ms. Thomson's claim that Joyce failed to provide reasonable accommodations for her disability. Title III of the ADA prohibits private entities providing public accommodations—such as Joyce—from discriminating against individuals "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages,

---

F. App'x 685 (10th Cir. 2014). There, the court held that a suspended student's claim for equitable relief under the ADA was moot, explaining that because the student "no longer intends to ever attend SNU, [he] is not susceptible to continued injury." *Id.* at 690. Ms. Thomson, by contrast, very much wishes to return to Joyce to complete her degree. Joyce argues that because Ms. Thomson was expelled for violating Joyce's Code of Conduct, she is not eligible to return and her desire to do so is irrelevant. But Ms. Thomson maintains that Joyce's reliance on the Code of Conduct was pretextual and that she was actually expelled in retaliation for exercising her rights under the ADA. Because success on this claim would entitle Ms. Thomson to return to Joyce, this case presents a dispute that is "definite, concrete, and amenable to specific relief." *Jordan v. Sosa*, 654 F.3d 1012, 1024 (10th Cir. 2011) (cleaned up).

[4] Ms. Thomson also alleges that Joyce violated the Rehabilitation Act but, based on the evidentiary hearing, it appears that Joyce does not receive any federal funding. *See* Dkt. No. 26 at 191–192 (191:23–192:2). It follows that Ms. Thomson has failed to show that she is likely to establish that Joyce is even subject to the Rehabilitation Act, let alone that she is likely to succeed on her claims under that statute. *See* 29 U.S.C § 794.

or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). For purposes

of Title III, discrimination on the basis of a disability is defined to include

> a failure to make reasonable modifications in policies, practices, or
> procedures, when such modifications are necessary to afford such goods, services,
> facilities, privileges, advantages, or accommodations to individuals with
> disabilities, unless the entity can demonstrate that making such modifications
> would fundamentally alter the nature of such goods, services, facilities, privileges,
> advantages, or accommodations.

42 U.S.C. § 12182(b)(2)(A)(ii).

This definition resembles language found in Title I of the ADA, which applies to private

employers and defines discrimination to include "not making reasonable accommodations to the

known physical or mental limitations of an otherwise qualified individual with a disability who is

an applicant or employee, unless such covered entity can demonstrate that the accommodation

would impose an undue hardship on the operation of the business of such covered entity." 42

U.S.C. § 12112(b)(5)(A). As a textual matter, "there appears to be little, if any, substantive

difference between the 'reasonable accommodation' which title I requires and the 'reasonable

modification' which title III mandates." *Dahlberg v. Avis Rent A Car System, Inc.*, 92 F. Supp. 2d

1091, 1105 (D. Colo. 2000). Indeed, although Congress used the term "reasonable

modifications" in Title III, "it used the term 'reasonable accommodations' elsewhere in the ADA

without apparent distinction." *Berardelli v. Allied Servs. Inst. of Rehab. Med.*, 900 F.3d 104, 116

(3rd Cir. 2018).

Numerous courts have thus applied the analytic framework developed in cases decided

under Title I when addressing Title III cases. *See, e.g.*, *Johnson v. Gambrinus Co./Spoetzl

Brewery*, 116 F.3d 1052 (5th 1997); *Staron v. McDonald's Corp.*, 51 F.3d 353 (2nd Cir. 1995);

*Redding v. Nova Se. Univ., Inc.*, 165 F. Supp. 3d 1274 (S.D. Fla. 2016); *Powers v. MJB

Acquisition Corp.*, 993 F. Supp. 861 (D. Wyo. 1998); *cf. Robertson v. Las Animas Cnty. Sheriff's*

16

*Dep't*, 500 F.3d 1185, 1195 n.8 (10th Cir. 2007) (explaining that "*Title II*'s use of the term

'reasonable modifications' is essentially equivalent to Title I's use of the term 'reasonable

accommodations'") (emphasis added); *Wong v. Regents of Univ. of California*, 192 F.3d 807, 816

n.26 (9th Cir. 1999) (concluding that although *Title II* "uses the term 'reasonable modification'

rather than 'reasonable accommodation,' these terms do not differ in the [legal] standards they

create"). The court will follow these decisions and address Ms. Thomson's claims by applying

the well-developed caselaw from the Title I context.

"To establish a prima facie failure-to-accommodate claim" a plaintiff must show that "(1)

he was disabled; (2) he was otherwise qualified; (3) he requested a plausibly reasonable

accommodation; and (4) Defendant refused to accommodate his disability." *Dansie v. Union Pac.*

*R.R. Co.*, 42 F.4th 1184, 1192 (10th Cir. 2022). "If a plaintiff establishes a prima facie claim, the

burden then shifts to the defendant to present evidence either conclusively rebutting one or more

elements of plaintiff's prima facie case or establishing an affirmative defense." *Id.* at 1193

(cleaned up). At least for present purposes, "Joyce does not dispute that Ms. Thomson is a

qualified individual with a disability." Dkt. No. 20 at 23. The court must thus consider whether

Ms. Thomson is likely to succeed in showing both that she "requested a plausibly reasonable

accommodation" and that Joyce "refused to accommodate [her] disability." *Dansie*, 42 F.4th at

1192.

Ms. Thomson claims that her "requests for reasonable accommodations were frequently

met with resistance and reluctance." Dkt. No. 5-5 ¶ 3. But after carefully considering the

evidence that the parties have presented so far, the court concludes that Ms. Thomson is unlikely

to succeed in showing that Joyce refused to accommodate her disability—to the contrary, Joyce

indisputably provided numerous accommodations in response to her requests.

When Ms. Thomson first transferred to Joyce University in January 2022, she requested three accommodations: "additional time for tests and quizzes, a quiet testing space and the presence of a service dog." Dkt. No. 20-2 at 9. Joyce approved all three. Two months later, Ms. Thomson requested and was granted another accommodation: "an additional 2 days to complete an assignment, on a case-by-case basis." *Id.* at 11. And the following year, Joyce approved multiple additional requested accommodations, including permission to (1) leave the classroom for access to the restroom, medications, and any other health treatments, (2) have a water bottle in class to maintain hydration, and (3) use compression over her extremities or abdomen to achieve upright exercise consistently. *See id.*

Ms. Thomson does not dispute that she was granted these accommodations. But she contends that Joyce failed to grant additional accommodations she requested for (1) exam extensions in case of hospitalization, (2) excused absences above and beyond the normal policy, and (3) permission to attend a shortened clinical shift without Daisy on March 21, 2023.

It is true that Joyce did not in these instances grant the *precise* accommodation Ms. Thomson requested. But "under the ADA a qualified individual with a disability is not entitled to the accommodation of her choice, but only to a reasonable accommodation." *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1177 (10th Cir. 1999) (quoting *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997)). As the Tenth Circuit has held under Title I of the ADA, "[i]f more than one accommodation would allow the individual to perform the essential functions of the position, the employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide." *Id.* (quoting *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1137 (8th Cir. 1999) (*en banc*)) (cleaned up). And once an

employer—or in this case a public entity—"has offered such [an accommodation], its duties have been discharged." *Id.* Based on the evidence the parties have submitted so far, the court concludes that Ms. Thomson is unlikely to succeed in showing that Joyce failed to offer a reasonable accommodation in response to any of the requests that form the basis of her claim.

The court first addresses Ms. Thomson's request for exam accommodations. Ms. Thomson has presented evidence that her central IV line creates a risk of blood infections that can require hospitalization. *See* Dkt. No. 5-2 ¶¶ 17–18. In August 2022, during final exams, Ms. Thomson was admitted to the hospital because of such an infection. *See* Dkt. No. 20-2 ¶ 9. According to Kelsi Cottrell, Ms. Thomson's Academic Advisor at Joyce University, "[a]ll Joyce University instructors worked to accommodate Thomson" while she was hospitalized. *Id*. Ms. Thomson later "requested two extra days to take exams in the hypothetical event she was in the hospital," but "Joyce University determined that its existing policy sufficiently covered this scenario." *Id.* ¶ 11.

Joyce later followed up by sending "Ms. Thomson's instructors an 'ADA Accommodations Plan' informing them of Ms. Thomson's approved accommodations and emphasizing that instructors are to grant exam accommodations in the event that hospitalization occurs during one or more days of the exam window." *Id.* The ADA Accommodations Plan that Joyce sent to Ms. Thomson's instructors includes a heading styled "Exam extension" with three bullet points explaining the accommodation. *Id.* at 16. First, "The hospitalization is during one or more days of the exam window and is directly related to the disability for which the accommodation is granted. (Documentation is required for each hospitalization, the date of the end of the hospitalization needs to be included in the documentation.)" *Id.* Second, "Exam

windows will be extended by 24 hours after the hospital stay has ended." *Id.* And third, "Student is responsible to present documentation at the time the exam extension is requested." *Id.*

Ms. Thomson asserts that this accommodation was inadequate, dismissing it as "a complicated concession that would allow an extension only if hospitalizations occurred during specific times." Dkt. No. 29 at 19. The court disagrees——the "specific times" to which Ms. Thomson refers are exam windows, which is hardly surprising given that the accommodation was intended to address the need for exam extensions due to hospitalization. Ms. Thomson has presented no evidence that exams occurred outside of exam windows or any explanation why she would need *exam* extensions if she were hospitalized at other times.

Ms. Thomson does represent that on one occasion she "checked herself out of the hospital against medical advice to take an exam, due to fear of being removed from the course." Dkt. No. 5-5 ¶ 4. But Ms. Thomson presents no evidence that she spoke to anyone at Joyce about this hospitalization, let alone that Joyce would not have accommodated her had she done so. Nor does her fear seem reasonable given that Joyce accommodated her hospitalization during her August 2022 exam window, as well as the express language of the exam extension accommodation that Joyce subsequently sent to her instructors. While the exam accommodation Joyce provided may not have been Ms. Thomson's preferred accommodation, the court concludes that she has failed to show that she is likely to succeed in establishing that it was unreasonable.

The court next turns to Ms. Thomson's request for additional excused absences beyond those permitted under Joyce's generally applicable attendance policy. Ms. Thomson argues that "Joyce refused [her] repeated requests to assure [her] that . . . disability-related medical absences would be excused." Dkt. No. 5-5 ¶ 4.

Joyce did not ignore Ms. Thomson's request for accommodations related to the attendance policy, however. Rather, it granted her one "free absence" per semester in addition to the free absence per semester afforded by the regular attendance policy, with any further absences to be reviewed on a case-by-case basis with supporting documentation. *See* Dkt No. 20-2 at 16; Dkt. No. 5-5 ¶ 5.

Ms. Thomson contends that this accommodation "did nothing to assure Ms. Thomson that she could seek emergency medical care when necessary, without fear that she might incur an unexcused absence by so doing." Dkt. No. 29 at 19. And she represents that because of "this uncertainty, [she] delayed seeking treatment for possible infections . . . jeopardizing her health and safety." *Id.* at 18.

While Ms. Thomson may have preferred that Joyce provide her an *ex ante*, *carte blanche* excuse for any medical absences, the court concludes that she has failed to show that she is likely to succeed in establishing that the accommodation that Joyce did provide was inadequate. On its face, Joyce's requirement that Ms. Thomson submit documentation for medical absences does not appear unreasonable—especially given that Ms. Thomson was afforded two free absences per semester for which no documentation was required. Nor has Ms. Thomson produced any evidence that Joyce failed to excuse any absence for which she submitted medical documentation or that she had any reasonable basis to fear that it would not excuse legitimate medical absences.

Finally, the court considers Ms. Thomson's request to attend a shortened five-hour shift without Daisy on March 21, 2023. It bears emphasis that Ms. Thomson made this request by email to Joyce at 10:28 AM in the morning of the 21st and that her shift was scheduled to begin at 1:00 PM the same day. *See* Dkt. No. 20-6 at 13; Dkt. No. 26 at 171 (171:20–23). It also bears noting that Ms. Thomson was already attending ten-hour clinic shifts rather than the usual

twelve-hour shifts—though the court will not attempt to resolve the parties' dispute regarding why this was so. *See* Dkt. No. 26 at 56–57 (56:15–57:5).[5] Joyce responded by instructing Ms. Thomson not to attend her clinical shift on the 21st, explaining that her absence that day would count as her "one additional absence above the attendance policy" and would accordingly have no negative ramifications on her classes or grades. Dkt. No. 20-6 at 15.

This undoubtably was not Ms. Thomson's preferred accommodation. But had she accepted it, she would have avoided having to work a ten-hour shift without Daisy, which had recently proved problematic for her. It follows that it was a reasonable accommodation. After all, in the context of Title I, the Tenth Circuit has squarely held that reasonable accommodations are "those accommodations which *presently*, or *in the near future*, enable the employee to perform the essential functions of his job." *Dansie*, 42 F.4th at 1193 (emphasis added; cleaned up). In the Title III context, it would follow that a reasonable modification (*i.e.*, accommodation) is one that presently or in the near future permits an individual to participate in the essential aspects of the "goods, services, facilities, privileges, advantages, or accommodations," 42 U.S.C. § 12182(b)(2)(A)(ii), of any "place of public accommodation." § 12182(a). And given Ms. Thomson's various requests for excused absences as accommodations, she surely cannot be heard to argue that missing a single clinical shift without any negative academic repercussions prevented her from participating in the *essential* aspects of Joyce's nursing program.

Joyce never represented that it was presenting a long-term solution for problems relating to Daisy's health or that it was unwilling to consider other possible accommodations for future

---

[5] Ms. Thomson testified that her shift was shorter than that of other clinical students because of a scheduling conflict between her class schedule at Joyce and the clinical rotation schedule at St. Mark's. *See* Dkt. No. 26 at 56:15–57:5. But at the evidentiary hearing, counsel for Joyce implied that Ms. Thomson had requested the shorter shift as an accommodation. *See id.*

shifts. Rather, it was reacting on extremely short notice to Ms. Thomson's eleventh-hour request for an accommodation for one specific shift. Nor was it Joyce's responsibility to anticipate the need for future accommodations to address similar potential problems. As the Tenth Circuit has held in the context of Title I, "[i]t is not the employer's responsibility to anticipate the employee's needs and affirmatively offer accommodation if the employer is otherwise open to such requests." *Koessel v. Sublette Cnty. Sheriff's Dep't*, 717 F.3d 736, 745 (10th Cir. 2013). And given the numerous accommodations Joyce *had* previously offered, the court concludes that Ms. Thomson has failed to show that she is likely to succeed in establishing that Joyce was not open to requests for further accommodations—let alone that Joyce's response demonstrated "a complete breakdown in the interactive process," Dkt. No. 29 at 22—simply because it denied her last-minute request to attend a shortened clinical shift on March 21st without Daisy and offered a different accommodation instead.

In short, based on the evidence that the parties have presented so far, it appears that Joyce offered Ms. Thomson reasonable accommodations in response to her requests, even if the accommodations were not always the ones Ms. Thomson would have preferred. The court thus concludes that Ms. Thomson has failed to demonstrate that she is likely to succeed in showing that Joyce failed to accommodate her disability.

### C.

The court must next consider whether Ms. Thomson has shown that she is likely to succeed on her retaliation claim. In addition to prohibiting direct discrimination on the basis of disability, the ADA also provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter." 42 U.S.C. § 12203(a). The ADA further provides that it "shall be unlawful to coerce, intimidate,

threaten, or interfere with any individual in the exercise or enjoyment of . . . any right granted or protected by this chapter." 42 U.S.C. § 12203(b).

To establish a *prima facie* retaliation claim under the ADA, a plaintiff must show that (1) she engaged in a protected activity, (2) the defendant took a materially adverse action against her, and (3) there was a causal connection between the protected activity and the adverse action. *See Selenke v. Medical Imaging of Colo.*, 248 F.3d 1249, 1264 (10th Cir 2001). If a plaintiff establishes a *prima facie* case, then "the burden shifts to the employer to offer a nondiscriminatory reason for the challenged action." *Id.* If the defendant "satisfies this burden of production, then, in order to prevail on her retaliation claim, the plaintiff must prove that the [defendant's] articulated reason for the adverse action is pretextual, i.e. unworthy of belief." *Id.* (cleaned up).

Here there can be no question that Ms. Thomson is likely to succeed in establishing the first two elements of a *prima facie* case. It is well settled that "[p]rotected activity includes requesting an accommodation." *Aubrey v. Koppes*, 975 F.3d 995, 1015–16 (10th Cir. 2020). And she was dismissed from the nursing program, which surely "well might have dissuaded a reasonable [person] from making or supporting a charge of discrimination" and thus meets the definition of a materially adverse action. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (cleaned up).

Although little else suggests a causal relationship between Ms. Thomson's requests for accommodations and her dismissal, that dismissal did occur just one week after her March 16th email requesting additional accommodations from Joyce and only two days after her request to work a shortened shift on March 21st without Daisy. *See* Dkt. 5-5 ¶¶ 17–23. That close temporal proximity may support—though it certainly does not require—a finding that she is likely to

24

succeed in establishing to satisfy the third element of her *prima facie* case. *Cf. Butler v. City of Prairie Vill.*, 172 F.3d 736, 752 (10th Cir. 1999).

But even assuming that Ms. Thomson has established that she is likely to succeed in establishing a *prima facie* case of retaliation, the court has no difficulty whatsoever in concluding that Joyce has demonstrated that it will meet its burden of offering a legitimate, nondiscriminatory reason for dismissing Ms. Thomson from its nursing program. According to Joyce, the reason for Ms. Thomson's dismissal was that despite being told multiple times by multiple Joyce staff members not to attend her clinical rotation at St. Mark's without Daisy, she violated these direct orders on March 21, 2023.

Ms. Fischer testified that on February 28th—the night Ms. Thomson had her medical episode while working without Daisy—she told Ms. Thomson in no uncertain terms that she was not permitted to attend her clinical shifts without her service dog. *See* Dkt. No. 20-4 ¶ 6; Dkt. No. 26 at 105 (105:16–24). Mr. West testified that he was present and heard Ms. Fischer tell Ms. Thomson this. *See* Dkt. No. 20-5 ¶ 6; Dkt. No. 26 at 186–87 (186:13–187:23). In addition, Mr. Stanley testified that he left the March 13th meeting with the understanding that "it would be required for [Ms. Thomson] to be present with Daisy when she is attending clinicals." Dkt. No. 26 at 144 (144:2–4). Finally, on March 21, 2023, Ms. Richards replied to Ms. Thomson's request to work without Daisy stating, "If Daisy is unable to accompany you to your clinical shift you will need to follow the attendance policy and submit the appropriate documentation to the clinical team. . . . Today's clinical absence will fall into this accommodation as your one additional absence above the attendance policy." Dkt. No. 20-6 at 15.

Despite these repeated directions not to attend her clinical shift without Daisy, Ms. Thomson did just that. Joyce contends that Ms. Thomson's "decision to show up to her clinical

without Daisy was in direct defiance of instruction from Joyce University and St. Mark's, which violated the Joyce University Student Code of Conduct." Dkt. No. 20 at 29. Based on this evidence, the court concludes that Joyce has shown that it will meet its burden of providing a legitimate, nondiscriminatory reason for dismissing Ms. Thomson from its program.

The court must thus consider whether Ms. Thomson has shown that she is likely to succeed in establishing that Joyce's asserted reason was pretextual. If this were a motion for summary judgment, Ms. Thomson would be required to identify evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [defendant's] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the [defendant] did not act for the asserted non-discriminatory reasons." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (cleaned up). But because this is a motion a preliminary injunction, she must show not only that it is *possible* that a reasonable factfinder *could* make this finding and draw this inference, but also that it is *likely* that the factfinder *would* do so.

To establish pretext, Ms. Thomson first insists that she was never told she could not attend her clinical shifts without Daisy. But her contemporaneous communications suggest otherwise. Indeed, when Daisy first fell ill on March 13, 2023, Ms. Thomson wrote in an email to Mr. Stanley, "What do you want me to do in this type of situation? Based on the meeting today, *I don't even know if the site will take me without her*." Dkt. No. 20-3 at 10 (emphasis added).

Ms. Thomson also represents that she had a conversation with Ms. Fischer regarding her "Labor and Deliver rotation." Dkt. No. 22-1 ¶ 2. According to Ms. Thomson, she told Ms. Fischer that she "thought having a dog present while patients were delivering a baby might make

26

some people uncomfortable," and Ms. Fischer then "asked if [Ms. Thomson] could attend [her] shift without Daisy." *Id.* Ms. Thomson represents that she "told her yes, that was possible, but that [she] would prefer to do so for a shorter period of time." *Id.* According to Ms. Thomson, Ms. Fischer next her if she had "a rescue medication" for her POTS and whether Ms. Thomson "would be willing to leave Daisy in a crate." *Id.*

At the evidentiary hearing, Ms. Fischer testified that she did not remember talking to Ms. Thomson about labor and delivery. Ms. Fischer further testified,

> I had a conversation with her on the 14th when she came down to our conference room at the end of shift. And she was upset that—she had heard some CNAs talking that said that she was not going to be welcome on the postpartum floor. And at that time, she asked me if there could be other arrangements.

> And I reached out via email to my lead, Mykel, and asked her if she could be put to three west because she wasn't going to be comfortable on postpartum.

Dkt. No. 26 at 106 (106:13–21). When asked if it was possible that she had a conversation "about [Ms. Thomson] going without Daisy during clinical rotations," Ms. Fischer replied, "I may have that day, but I honestly don't recall." *Id.* at 107 (107:15–17). The questioning attorney followed up, "And how would that be the case if you had directly told her on February 28th that she was not to do that without Daisy" *Id.* at 107 (107:18–19). Ms. Fischer answered, "She had Daisy with her that day. On the 14th, Daisy was with her, so there was no reason for me to have a conversation about Daisy because she had her dog with her." *Id.* at 107 (107:20–22).

Even if Ms. Thomson's account of the conversation is accurate, she has offered no evidence that she was scheduled to work on the labor and delivery floor on March 21, 2023. Further, on that day Joyce specifically denied her request to attend her clinical shift without Daisy. To be sure, Ms. Thomson argues that the March 21st email from Ms. Richards was unclear and confusing. This court disagrees—on its face, it is clear enough that if Daisy could not attend the clinic with her, she must use her additional free absence.

When asked at the evidentiary hearing why she attended without Daisy that day, Ms. Thomson answered: "Because if I went—or if I took that absence and this was my second absence, then I would get in trouble. And if I didn't—or wait. Pretty much, I'd get in trouble either way if—yeah." Dkt. No. 26 at 74 (74:22–25). The email, however, clearly indicated that Ms. Thomson would *not* be in trouble for taking the absence because that absence would count as Ms. Thomson's "one additional absence above the attendance policy." Dkt. No. 20-6 at 15. Further, Ms. Thomson's testimony—in particular her assertion that she would "get in trouble either way"—leaves little doubt that she understood she did not have permission to attend her clinical shift without Daisy.

As Joyce also notes, Ms. Thomson had previously indicated that she was attempting to save her remaining free absence so that she could attend a concert in Las Vegas three days later. *See* Dkt. No. 20-3 at 10. If Ms. Thomson had followed Ms. Richards' instructions and taken an absence on March 21, 2023, she presumably would have been unable able to miss school and attend that concert without academic consequences. While not conclusive, this evidence at least suggests a possible motive for Ms. Thomson's decision to disregard Ms. Richards' instructions.

The only other evidence Ms. Thomson offers to show pretext is her February 15, 2023 ADA Accommodations Plan, which states: "Use of a service animal in all classes, lab, SCE. Clinicals will be determined by location." Dkt. No. 20-2 at 15. But this document predates the incident of February 28, 2023, when Ms. Thomson was unable to complete her shift without Daisy and the instructions she received as a result of that incident. In all events, Ms. Thomson presents no evidence that any determination was ever made that she was authorized to attend her clinical shifts *at St. Mark's* without Daisy. Indeed, after the February 28th incident, she was specifically instructed not to do so.

Because Ms. Thomson has failed to show that she is likely to succeed in establishing that Joyce's proffered legitimate, non-discriminatory reason for her dismissal was pretextual, the court concludes that she has failed to show a likelihood of success on the merits of her retaliation claim.

*    *    *

As the Supreme Court has made clear, a "plaintiff seeking a preliminary injunction *must* establish that he is likely to succeed on the merits" of his claims. *Winter*, 555 U.S. at 20 (emphasis added). Because Ms. Thomson has failed to do so, her motion for a preliminary injunction is **DENIED**.

**IT IS SO ORDERED.**

Dated this 16th day of August, 2024.

BY THE COURT:

_____
Howard C. Nielson, Jr.
United States District Judge